C. R. HUMPHREYS GENERAL CONTRACTOR, INC.
v.
TANGIPAHOA PARISH SCHOOL SYSTEM AND GOSSEN-GASAWAY-HOLLOWAY, LTD.
No. 2007 CA 0993.
Court of Appeal of Louisiana, First Circuit.
December 21, 2007.
NOT DESIGNATED FOR PUBLICATION.
KEVIN P. LANDRENEAU, Counsel for Plaintiff/Appellant, C. R. Humphreys General Contractor
ALTON B. LEWIS, Counsel for Defendants/Appellees, Tangipahoa Parish School System and Gossen-Gasaway-Holloway, Ltd.
Before WHIPPLE, GUIDRY and HUGHES, JJ.
WHIPPLE, J.
This matter is before us on appeal by a general contractor seeking sums allegedly due under a public works contract. Plaintiff, C. R. Humphreys General Contractor, Inc. ("C. R. Humphreys") appeals from a trial court judgment, dismissing with prejudice its claims to recover $11,505.18 for a requested change order, $11,600.00 withheld for punch-list items allegedly not completed, and damages allegedly caused by delays, interest, costs, and attorney's fees. For the following reasons, we affirm in part, reverse in part, and render.

FACTS AND PROCEDURAL HISTORY
On July 30, 2001, C. R. Humphreys and the Tangipahoa Parish School System ("the School System") entered into a contract for the construction of a shop building for Crystal Street Academy in Hammond, Louisiana.[1] The contract provided that C.R. Humphreys was to be paid $114,800.000 for performance of the contract and that the project was to be completed within 120 days from the date of the notice to proceed.
Prior to the issuance of the notice to proceed, the parties discovered that C. R. Humphreys could not obtain a building permit from the City of Hammond because the proposed location of the building as set forth in the plans was in a flood plain. Thereafter, Andrew Gasaway of Gossen-Gasaway-Holloway, Ltd., the project architect, revised the plans three times, each time attempting to relocate the building to a suitable location that would be most cost effective. Eventually, the School System agreed to the third relocation, and Gasaway thereafter issued the notice to proceed on November 14, 2001.
As a result of the plan revisions relocating the building site three times, C. R. Humphreys submitted to Gasaway a request for a change order for estimating time, field service work, additional underground electrical work, overhead, and profit. However, Gasaway disputed the request, stating that he believed it was "exorbitant," and, in a written response, cited C. R. Humphreys to article 7.3.10.6 of the specifications for proper itemization of the request.[2] C. R. Humphreys did not thereafter submit any itemization of the requested charges; consequently, Gasaway did not approve the request or issue a change order.
C. R. Humphreys proceeded with the work, after informing Gasaway in writing that by proceeding with the work, it was not waiving its right to a change order. In March 2002, C. R. Humphreys requested a certificate of substantial completion and a final punch list. Gasaway and Bernie Shontell, a representative of the School System, then inspected the building on March 6, March 20, and March 26, 2002.[3] The fire marshal also inspected the building on March 26, 2002, and he generated a list of items that needed correction, but nonetheless allowed for temporary occupancy of the building.
As a result of these inspections, Gasaway generated punch lists, setting forth items that needed to be completed or corrected, and he also directed C. R. Humphreys to complete all previous punch-list items and all items on the fire marshal's inspection report. The School System then issued a certificate of substantial completion on March 26, 2002
Thereafter, disputes arose between the parties as to C. R. Humphreys's responsibility for certain punch-list items and as to whether other items were corrected satisfactorily. Gasaway contended that various punch-list items were never properly completed, and he recommended withholding $11,600.00 from the contract price for outstanding punch-list items.
The dispute over C. R. Humphreys's request for a change order also continued. C. R. Humphreys again submitted a change-order request with the final payment application, seeking the additional sum of $11,505.18 for estimating time, labor, equipment, lost wages allegedly caused by the delay in issuing the notice to proceed, and profit and overhead attributed to the three revisions to the plans and additional work allegedly resulting from errors in the plans and specifications. In the change-order request, C. R. Humphreys also included a deduction for work and materials deleted by the architect in the plan changes and during the course of the project. However, Gasaway refused to approve a change order based on his assertion that the request for a change order was never submitted with the proper itemization. Thus, when final payment was made on the contract, the sum of $11,600.00 was withheld for outstanding punch-list items, and no amount was approved or paid toward the $11,505.18 change-order request. C. R. Humphreys then instituted this suit seeking to recoup these amounts, together with attorney's fees, interest, and court costs.
Following a bench trial, the trial court concluded that C. R. Humphreys did not complete the punch-list items and that it did not produce the required documentation to support a change order. Accordingly, the trial court rendered judgment, dismissing C. R. Humphreys's claims with prejudice. From this judgment, C. R. Humphreys appeals, listing seven assigmnents of error.

CHANGE-ORDER REQUEST (Assignments of Error Nos. 1, 4 & 5)
On appeal, C. R. Humphreys avers that the trial court erred in failing to find that Gasaway should have approved the change-order request that resulted from the errors in the design and plans. It also contends that the trial court made various erroneous factual findings relating to this issue.[4]
According to C. R. Humphreys, because the building was originally designed to be built in a flood plain, the plans were revised by the architect three times, causing C. R. Humphreys to incur additional expenses in estimating time, labor, field service work, and equipment and to suffer loss of income because of delays caused by the redrafting of the plans. C. R. Humphreys also contends that it was entitled to be paid for removing louvers and installing other material in their place because the School System and Gasaway decided that they did not want the louvers as originally designed. C. R. Humphreys further contends that it is entitled to the cost of constructing concrete landings in front of the two exterior doors because the landings were not in the plans and specifications.
According to C. R. Humphreys, it also subtracted $3,288.65 in its change-order request for deductions related to reduced electrical work and heating units, for a total change-order request of $11,505.18. C. R. Humphreys submits on appeal that defendants presented no evidence to refute the amount otherwise requested, and that the trial court accordingly erred in failing to award it this sum.
Contracts have the effect of law upon the parties, and the courts are bound to give legal effect to all contracts according to the common intent of the parties. This intent is determined by the words of the contract when they are clear and explicit and lead to no absurd consequences. LSA-C.C. arts. 1983, 2045 and 2046; O & M Construction, Inc. v. State, Division of Administration, 576 So. 2d 1030, 1034 (La. App. 1st Cir.), writ denied, 581 So. 2d 691 (La. 1991). Section 4.3.7 of the general supplementary conditions of the contract, entitled "Claims for Additional Cost," provides that a contractor may make a claim for an increase in the contract sum, for reasons including, but not limited to, "a written order for a minor change in the Work issued by the Architect." Pursuant to section 4.4.1, upon receiving the contractor's written notice of a claim, the architect will review the claim and take one or more of the following preliminary actions: (1) request additional supporting data from the contractor; (2) submit a schedule indicating when the architect expects to take action; (3) reject the claim in whole or in part, stating the reasons for the rejection; (4) recommend approval of the claim; or (5) suggest a compromise. Pursuant to section 4.4.3, if the claim has not been resolved, the contractor shall then either: (1) submit additional supporting data requested by the architect, (2) modify the initial claim, or (3) notify the architect that the initial claim stands.
Additionally, Article 7 of the general and supplementary conditions of the contract, dealing with "Changes in the Work," provides, in pertinent part, as follows:
7.1 CHANGES
7.1.1 Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order, Construction Change Directive or order for a minor change in the Work, subject to the limitations stated in this Article 7 and elsewhere in the Contract Documents.
7.1.2 A Change Order shall be based upon agreement among the Owner, Contractor and Architect; a Construction Change Directive requires agreement by the Owner and Architect and may or may not be agreed to by the Contractor; an order for a minor change in the Work may be issued by the Architect alone.
* * *
7.2 CHANGE ORDERS
7.2.1 A Change Order is a written instrument prepared by the Architect and signed by the Owner, Contractor and Architect, stating their agreement upon all of the following:
.1 a change in the Work;
.2 the amount of the adjustment in the Contract Sum, if any; and
.3 the extent of the adjustment in the Contract Time, if any.
7.2.2 Methods used in determining adjustments to the Contract Sum may include those listed in Subparagraph 7.3.3.
7.3 CONSTRUCTION CHANGE DIRECTIVES
7.3.1 A Construction Change Directive is a written order prepared by the Architect and signed by the Owner and Architect, directing a change in the Work and stating a proposed basis for adjustment, if any, in the Contract Sum or Contract Time, or both. The Owner may by Construction Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum and Contract Time being adjusted accordingly.
7.3.2 A Construction Change Directive shall be used in the absence of total agreement on the terms of a Change Order.
* * *
7.3.4 Upon receipt of a Construction Change Directive, the Contractor shall promptly proceed with the change in the Work involved and advise the Architect of the Contractor's agreement or disagreement with the method, if any, provided in the Construction Change Directive for determining the proposed adjustment in the Contract Sum or Contract Time.
* * *
7.3.6 If the Contractor ... disagrees with the method for adjustment in the Contract Sum, the method and the adjustment shall be determined by the Architect on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the Contract Sum, an allowance for overhead and profit in accordance with paragraphs 7.3.10.1 through 7.3.10.6 below. In such case, and also under Clause 7.3.3.3, the Contractor shall keep and present, in such form as the Architect may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Contract Documents, costs for the purposes of this Subparagraph 7.3.6 shall be limited to the following:
.1 costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' or workmen's compensation insurance;
.2 costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;
.3 rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others;
.4 costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work; and
.5 additional costs of supervision and field office personnel directly attributable to the change.
.6 Without invalidating the Contract, Owner and contractor acknowledge and agree that occasions may arise during the performance of the Contract when the Owner, upon the recommendation of the Architect, may choose to alter, add or deduct from the Work and an agreement on the price or sum cannot be reached between Owner and Contractor on either a lump sum or unit price basis. On those occasions, Owner may, by a written directive, order the Contractor to perform or delete the work for a price or sum equal to the Contractor's actual, necessary and reasonable costs to perform and administer the work. The contractor's cost shall include and be limited to, the following:
Contractor shall not be entitled to, and hereby waives, any claim for either a lump sum fee or a percentage fee on the cost of the Work, directly or indirectly associated with any such extra work. Contractor's actual administrative fees and costs in processing, pricing and finalizing any such change order shall be limited to a cap of the lesser of the dollar value of 20 man hours or $1,000.00. Hourly rates of Contractor's personnel shall be submitted by Contractor and approved by Owner prior to the execution of the Contract and shall then be used as a unit cost to price such administrative fees.
* * *
7.3.10.6 In order to facilitate checking of quotations for extras or credits, all proposals, except those so minor that their propriety can be seen by inspection, shall be accompanied by a complete itemization of costs including labor, materials and Subcontracts. Labor and materials shall be itemized in the manner prescribed above. Where major cost items are Subcontracts, they shall be itemized also. In no case will a change involving over $1,000 be approved without such itemization. (Emphasis added).
The burden of proof is upon the contractor to establish by a preponderance of the evidence that he is entitled to the amount requested in a change-order request. See Powerhouse Wholesale Electrical Supply, Inc. v. Spartan Building Corporation, 525 So. 2d 1216, 1220 (La. App. 1st Cir. 1988); Abraham v. Greater Baton Rouge Consolidated Sewerage District, 159 So. 2d 525, 527 (La. App. 1st Cir. 1963), writ refused, 245 La. 969, 162 So. 2d 15 (1964). In the instant case, C. R. Humphreys submitted a change-order request at the end of the project seeking payment in the amount of $11,505.18, which request was "itemized" by simply listing terms such as "estimating time"; "field service"; "material," "labor," and "equipment" for "additional underground electrical"; "electrical estimating"; and "lost wages," with a lump sum charge listed after each term.
When asked at trial what documentation he used to support the listed charges, Mr. Humphreys testified that he believed that the change-order request itself supported the charges. When questioned about the electrical labor charge, Mr. Humphreys stated that that was the amount his electrician charged him. However, he admittedly did not submit the electrician's bill, either with the change-order request or at trial, to support this charge. Similarly, with regard to the charge for electrical "estimating," Mr. Humphreys never submitted any documentation to support that charge. Mr. Humphreys also never supplied Gasaway with his estimating records or bills for materials. Because he believed the change-order request was "self supporting," Mr. Humphreys did not submit any documentation with the request.
Gasaway, on the other hand, testified that C. R. Humphreys's change-order request was exorbitant and that Mr. Humphreys never submitted an itemized request as required by the contract. Gasaway acknowledged that there possibly were additional costs incurred to extend the electrical service when the building was ultimately moved thirty feet north of the originally proposed site. However, while C. R. Humphreys charged $3,269.20 for the additional electrical work in its final change-order request, Gasaway stated, Shontell had estimated the cost of this additional electrical work would be only $1,000.00, including labor, material, overhead, and profit.[5]
Gasaway also acknowledged that C. R. Humphreys would have been required to perform some recalculations or estimating based on the change in location of the building, and he thought $720.00 would be a reasonable charge for those recalculations. However, he admitted that the location of the building on the site was changed three times.
Nonetheless, Gasaway denied the entire change-order request of $11,505.18. In explaining his decision to reject the entire change-order request, Gasaway stated that Mr. Humphreys never submitted the proper itemization, documentation, or working papers to support the claimed charges. Specifically, Gasaway stated that the change-order request did not itemize how many workers performed the work, the days the work was performed, or what work was performed. Also, the request simply lists a charge for "material," without any itemization of what type of material was used or any verification of those charges.
With regard to the requested sums associated with the removal of two wall louvers and handicap accesses for the exterior doors, both Gasaway and Shontell disputed C. R. Humphreys's entitlement to those sums. Gasaway testified that C. R. Humphreys incorrectly installed the louvers, causing rain water to enter the building through the louvers. Because the cost of removing the louvers would be cheaper than reinstalling the louvers correctly, Gasaway and Shontell agreed to allow C. R. Humphreys to remove the louvers and replace them with plywood. Thus, Gasaway opined that C. R. Humphreys was not entitled to additional costs to correct its mistake.
Regarding the handicap accesses, Gasaway testified that C. R. Humphreys failed to initially construct the landings at the doors in accordance with the specifications, which included the requirements of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. Particularly, section 1084(B)(9)(f) of the specifications required that thresholds at doorways not exceed three-fourths inch in height for exterior sliding doors or one-half inch for other types of doors. However, as constructed, the threshold was one and one-half inches below the doorway.
Because the thresholds did not conform with the ADA, the fire marshal would not issue a fire marshal's certificate as constructed. C. R. Humphreys attempted to correct the problem by pouring additional cement on top of the slab to construct a ramp at the two doorways.[6] C. R. Humphreys then attempted to charge the School System for this work in its change-order request based on the assertion that the threshold requirements were not part of the plans and specifications. However, Mr. Humphreys acknowledged at trial that the threshold requirement was contained in the specifications for this project.
Also, with regard to C. R. Humphreys's request for lost wages for delay in the start of the project, we note that there was conflicting evidence and testimony as to the reason why the notice to proceed was not issued until November 14, 2001.
The record establishes that there were several deductions resulting from changes in the work, which deductions had been valued at $3,288.65 by C. R. Humphreys. These deductions would have been subtracted from the costs of any additional work required; however, because no change order was ever authorized, the amount of the deductions was actually never subtracted from the contract price paid to C. R. Humphreys.
Considering the foregoing and the record as a whole, we cannot conclude that the trial court was manifestly erroneous in its finding that C. R. Humphreys failed to produce documentation to support its change-order request and, thus, failed to establish its entitlement to a change order. Pursuant to sections 4.4.3, 7.3.6, and 7.3.10.6 of the general and supplementary conditions, C. R. Humphreys was contractually obligated to furnish specific itemization and supporting data to establish its alleged costs when a dispute arose as to the charges it claimed in its requested change order. Because C. R. Humphreys also failed to produce such support for its claim at trial, we cannot conclude that the trial court erred in denying its claim for $11,505.18 for the requested change order. These assignments of error lack merit.

SUMS WITHHELD FOR PUNCH-LIST ITEMS (Assignments of Error Nos. 1, 2 & 3)
C. R. Humphreys further contends on appeal that the trial court erred in failing to award the $11,600.00 withheld by defendants for the value of punch-list items. According to C. R. Humphreys, the trial court also erred in failing to find that defendants were required by law to itemize and value each item on the punch list in accordance with LSA-R.S. 38:2248(B) and manifestly erred in certain factual findings.
A contractor is obligated to perform in accordance with the contract, plans, and specifications. Where remedial work is required to complete a project in accordance with the plans and specifications, the cost of such remedial work must be borne by the party at fault. However, a party seeking to have the contract price reduced by an amount to perfect or complete work done under the contract bears the burden of proving the necessity of such perfection or completion and its cost. O & M Construction, Inc., 576 So. 2d at 1039.
Moreover, LSA-R.S. 38:2248(B), dealing with public works contracts, provides as follows:
All public works contracts shall contain a clause stating that any punch list generated during a construction project shall include the cost estimates for the particular items of work the design professional has developed based on the mobilization, labor, material, and equipment costs of correcting each punch list item. The design professional shall retain his working papers used to determine the punch-list items cost estimates should the matter be disputed later. The contracting agency shall not withhold from payment more than the value of the punch list. Punch-list items completed shall be paid upon the expiration of the forty-five day lien period. The provisions of this Section shall not be subject to waiver, nor shall these provisions apply to the Department of Transportation and Development.[7] (Emphasis added).
However, at the trial below, defendants argued that LSA-R.S. 38:2248(B) was not applicable to the contract at issue because the effective date of the enacting legislation was not until July 2, 2001, after the project at issue had been let out for bids. The trial court agreed and concluded that this section did not apply herein. On review, we find that the trial court erred in so concluding.
Louisiana Revised Statute 38:2248(B) was added by Acts 2001, No. 1216, § 1, effective July 2, 2001. The contract at issue was confected no earlier than July 30, 2001.[8] Laws existing at the time contracts are entered into are incorporated into and form a part of the contract as though expressly written. Heck v. Lafourche Parish Council, 2002-2044 (La. App. 1st Cir. 11/14/03), 860 So. 2d 595, 603, writ denied, XXXX-XXXX (La. 3/19/04), 869 So. 2d 837; see also Professional Construction Services, Inc. v. Parish of Jefferson, 562 So. 2d 1184, 1185-1186 (La. App. 5th Cir. 1990)(wherein the court, in determining whether the attorney's fee provision of the Public Works Act applied to the contract at issue, stated that the determining factor was whether the attorney's fee provision was "in existence at the time the contract was signed.") Because LSA-R.S. 38:2248(B) was in effect when the contract was signed and because this section of the statute specifically provides that its provisions "shall not be subject to waiver," we must conclude that LSA-R.S. 38:2248(B)'s requirement that the architect's punch list include a cost estimate for each punch list item applies herein.
Moreover, even if LSA-R.S. 38:2248(B) were not applicable herein, this court has previously held, as stated above, that a party seeking to have the contract price reduced by an amount to perfect or complete work done under the contract bears the burden of proving the necessity of such perfection or completion and its cost. O & M Construction, Inc., 576 So. 2d at 1039. Thus, defendants were required to establish the costs of the items they alleged were incomplete or in need of correction.
While Gasaway and Shontell testified at length about the punch-list items they believed were incomplete or improperly performed, Gasaway acknowledged that he had not included in his punch lists an itemization of the value of each item on the punch list.[9] Rather, he recommended withholding the lump sum of $8,200.00 for architectural and fire marshal punch-list items and the lump sum of $3,400.00 for electrical punch-list items. When asked if he had any documentation to support these lump-sum figures, Gasaway stated that his punch lists were his documentation. Moreover, no evidence was presented at trial to establish the actual costs of completing or repairing the punch-list items.[10] Cf. O & M Construction, Inc., 576 So. 2d at 1039-1043(wherein State introduced evidence to establish the costs of repairing defective work and of completing punch-list items, thereby establishing that those sums were properly withheld from the contractor).
Considering the lack of evidence to establish the costs of correcting the punch-list items herein, we are constrained to conclude that the trial court erred in concluding that the defendants properly withheld $11,600.00 for completion of punch-list items.[11] Thus, the trial court's judgment must be reversed to award C. R. Humphreys the $11,600.00 withheld from the contract price for completion of punch-list items.

ATTORNEY'S FEES AND INTEREST (Assignments of Error Nos. 6 & 7)
In these assignments of error, C. R. Humphreys contends that the trial court erred in failing to award attorney's fees and interest on the sums it sought to recover. Louisiana Revised Statute 38:2191(B) provides that "[a]ny public entity failing to make any final payments after formal acceptance and within forty-five days following receipt of a clear lien certificate by the public entity shall be liable for reasonable attorneys fees."
When a public entity enters into a contract for the construction, alteration, or repair of any public works, the official representative of the public entity shall have recorded in the office of the recorder of mortgages, in the parish where the work has been done, an acceptance of the work or any specified area thereof upon substantial completion of the work. LSA-R.S. 38:2241.1; Diamond B Construction Company, Inc. v. City of Plaquemine, 95-1979 (La. App. 1st Cir. 4/30/96), 673 So. 2d 636, 641. The recordation of an acceptance in accordance with the provisions of this Section upon substantial completion shall be effective for all purposes under this Chapter. LSA-R.S. 38:2241.1; Diamond B Construction Company, Inc., 673 So. 2d at 641.
In the instant case, a certificate of substantial completion was issued by the owner and architect on March 26, 2002, and was recorded on May 14, 2002. Thereafter, the clerk of court for Tangipahoa Parish issued a clear lien certificate. C. R. Humphreys submitted its final pay request, Gasaway authorized final payment less the disputed amounts, and the School System paid the balance due on the contract less the requested change order amount and the amount withheld for punch-list items.
Because we have determined that the School System withheld $11,600.00 for punch-list items without properly itemizing or establishing the costs of those items and that, as such, C. R. Humphreys was entitled to collect that sum, we likewise must conclude that C. R. Humphreys is entitled to attorney's fees for the collection of that sum. Accordingly, we award C. R. Humphreys $5,000.00 in attorney's fees.[12]
With regard to interest, we also conclude that C. R. Humphreys is entitled to interest on the contract sum awarded herein from the date of its final pay request, July 2, 2002. See Thomas B. Catchings and Associates v. City of Baton Rouge, 621 So. 2d 767 (La. 1993). Thus, interest shall be awarded accordingly.

CONCLUSION
For the above and foregoing reasons, the January 18, 2007 trial court judgment dismissing C. R. Humphreys's claims with prejudice is reversed to the extent that it dismissed C. R. Humphreys's claim for sums withheld for punch-list items. Judgment is hereby rendered as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that there be judgment in favor of C. R. Humphreys General Contractor, Inc. and against the Tangipahoa Parish School System in the amount of $11,600.00, together with legal interest from July 2, 2002, until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment in favor of C. R. Humphreys General Contractor, Inc. and against the Tangipahoa Parish School System in the amount of $5,000.00 for attorney's fees.
To the extent that the January 18, 2007 judgment denied C. R. Humphreys's claim for sums sought pursuant to the change-order request, the judgment is affirmed.
Costs of this appeal are assessed one-half to C. R. Humphreys and one-half to the Tangipahoa Parish School System and Gossen-Gasaway-Holloway, Ltd.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
NOTES
[1] Although the contract was dated July 30, 2001, Clay Humphreys testified that he did not actually sign the contract until some later date. The contract was eventually recorded with the Tangipahoa Parish Clerk of Court on August 29, 2001.
[2] Article 7.3.10.6 of the supplementary conditions, which is located in the article addressing the procedure to be utilized for adjustment of the contract price resulting from changes in the work, provides as follows:

In order to facilitate checking of quotations for extras or credits, all proposals, except those so minor that their propriety can be seen by inspection, shall be accompanied by a complete itemization of costs including labor, materials and Subcontracts. Labor and materials shall be itemized in the manner prescribed above. Where major cost items are Subcontracts, they shall be itemized also. In no case will a change involving over $1,000 be approved without such itemization.
[3] Phillip Thomassee, the electrical engineer who designed the electrical work for the building for Gossen-Gasaway-Holloway, was also present at the March 6, 2002 inspection, and he generated a punch list of electrical items that were incomplete or needed correction.
[4] Specifically, in assignment of error number one, C. R. Humphreys contends that the trial court committed manifest error in finding that Mr. Humphreys did not deduct $3,389.00 in required deductions from the contract price and that C. R. Humphreys never processed an approved change order. With regard to the first allegedly erroneous factual finding, we acknowledge that the record shows that Mr. Humphreys did deduct this amount from his change-order request. Nonetheless, for the reasons that follow, we conclude that this erroneous statement by the trial court i.e., that he failed to do so, does not render the trial court's judgment erroneous.

With regard to the trial court's statement that C. R. Humphreys never "process[ed] an approved change order," C. R. Humphreys contends that this finding was erroneous because Gasaway was the party responsible for processing a change order, and he refused to process this change-order request. However, we observe that when the trial court's reasons are read as a whole, and the above statement is taken in context, the trial court clearly found that the failure to produce proper documentation to support the change-order request resulted in the change order never being approved. Thus, we find no merit to this argument.
[5] In the change-order request that C. R. Humphreys submitted in October 2001, it had charged $1,949.60 for the additional electrical work. However, in the subsequent change-order request submitted at the end of the project, it had increased this amount to $3,269.20.
[6] Defendants contend that the attempted repair of the door thresholds was improper and was never approved by the architect or owner. Defendants further contend that C. R. Humphreys should have removed the slab and replaced it in accordance with the specifications.
[7] In contrast, section 9.8.2.3 of the supplementary conditions to the contract herein provides, in pertinent part, as follows:

A "punch list of ... exceptions" and the dollar value related there-to will be prepared by the Architect. A monetary value will be assigned to this list, which is to be twice the estimated actual value of the work. Cost of these items shall be prepared in the same format as the schedule of values. None of these funds shall be due the Contractor until all punch-list items are completed and accepted by the Architect.
Gasaway acknowledged at trial that defendants were prohibited by law from withholding twice the estimated value of the punch-list items as provided in the contract herein.
[8] See footnote 1, supra.
[9] Mr. Humphreys disputed at trial that there were punch-list items that had not been completed. Rather, he testified that all punch-list items were either completed or were not required by the plans and specifications and that Gasaway's assertion that C. R. Humphreys had not completed some punch-list items was "blatantly untrue."
[10] With regard to one punch list item, i.e., painting of the conduit, Gasaway did testify that this was "probably a five hundred dollar thing." However, this was the extent of any testimony or evidence as to the actual cost of completing this item.
[11] Given our conclusion that $11,600.00 was improperly withheld from the contract price, where there was no itemization or evidence of the costs of completing the punch-list items, we pretermit discussion of C. R. Humphreys's assertion that the trial court made manifestly erroneous findings of fact with regard to this issue.
[12] In making this award, we note that these claims were vigorously contested in the two-day trial of this matter. Further, the trial involved the testimony of several witnesses and approximately 75 exhibits introduced into evidence during the course of the trial.